## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: SA HOSPITAL ACQUISITION GROUP, | : | Chapter 11 |
| | : | |
| Alleged Debtor. | : | Case No. 23-11367 (BLS) |
| _____ | : | |
| | : | |
| GOLDBERG HEALTHCARE PARTNERS, LLC, | : | |
| FARIBORZ SAIDARA, MATTHEW HADDAD, | : | |
| YOEL PESSO, | : | |
| Appellants, | : | |
| v. | : | Civ. No. 23-1147 (JLH) |
| | : | |
| MORRISANDERSON & ASSOCIATES, LTD., | : | |
| TWAIN GL XXV, LLC, AMERICAN HEALTHCARE | : | |
| SYSTEMS MISSOURI, LLC, | : | |
| | : | |
| Appellees. | : | |

Eric M. Sutty, Armstrong Teasdale LLP, Wilmington, DE; Aaron L. Hammer, Nathan E. Delman, Dante Wen, Horwood Marcus & Berk Chartered, Chicago, IL

   *Counsel for Appellants Goldberg Healthcare Partners, LLC, Fariborz Saidara, Matthew Haddad, and Yoel Pesso.*

Christoper A. Ward, Katherine M. Devanney, Polsinelli PC, Wilmington, DE; Brian W. Hockett, Thompson Coburn LLP, St. Louis, MO

   *Counsel for Appellee, MorrisAnderson & Associates, Ltd., as Receiver.*

William F. Taylor, Jr., Whiteford, Taylor & Preston LLP, Wilmington, DE

   *Counsel for Appellee, Twain GL XXV, LLC.*

Karen C. Bifferato, Connolly Gallagher LLP, Wilmington, DE; Robert E. Eggmann, David P. Stoeberl, Carmody MacDonald P.C., St. Louis, MO

   *Counsel for Appellee American Healthcare Systems Missouri, LLC.*

## **OPINION**

May 31, 2024

HALL, UNITED STATES DISTRICT JUDGE

## I.      INTRODUCTION

This appeal arises in the involuntary chapter 11 proceeding filed by Goldberg Healthcare Partners, LLC, Fariborz Saidara, Matthew Haddad, and Yoel Pesso (the "Petitioning Creditors") against alleged debtor SA Hospital Acquisition Group (the "Alleged Debtor"). The Petitioning Creditors appeal the Bankruptcy Court's September 28, 2023 order (B.D.I. 53)[1] (the "Dismissal Order"), which (1) granted appellee MorrisAnderson & Associates, Ltd.'s (the "Receiver's") motion to dismiss the involuntary proceeding or, in the alternative, to abstain in favor of the receivership currently pending in a Missouri state court (B.D.I. 22) ("Motion to Dismiss"), and (2) denied as moot the Petitioning Creditors' emergency motion to enforce the automatic stay and for sanctions (B.D.I. 11) (the "Motion to Enforce"). The Bankruptcy Court held an evidentiary hearing on September 19, 2023 (A000328–605) ("9/19/23 Tr.") and stated its reasoning for the Dismissal Order on the record on September 20, 2023 (A000464–477) ("9/20/23 Tr."). For the reasons set forth below, the Court will affirm the Dismissal Order.

## II.     BACKGROUND

### A.      The Parties

As the Bankruptcy Court observed, "While there are many disagreements between the parties, the operative facts here are not in material dispute." (9/20/23 Tr. at 4:13–15.) In 2020, SA Hospital Acquisition Group acquired in a bankruptcy proceeding the facility formerly known as St. Alexis Hospital in St. Louis, Missouri. The facility is currently known as South City Hospital ("South City

---

[1] The docket of the chapter 11 case, captioned *In re SA Hospital Acquisition Grp.,* No. 23-11367 (BLS) (Bankr. D. Del.), is cited herein as "B.D.I. __," and the Appendix (D.I. 13) filed in support of the Petitioning Creditors' opening brief is cited herein as "A__." Daniel Wiggins, a principal and financial advisory professional of the Receiver, filed a declaration in support of the Receiver's Motion to Dismiss (A000170–A000177), which is cited herein as "Wiggins Decl."

Hospital" or "SCH").  (Wiggins Decl. ¶ 4.)  The land underlying South City Hospital is owned by

Twain GL XXV, LLC ("Twain"), which leases the ground to a non-debtor affiliate of the Alleged

Debtor, SAH Real Estate.  (*Id*.)  SAH Real Estate owns the buildings and improvements and leases

the buildings and subleases the ground to the Alleged Debtor.  (*Id*.)  The Alleged Debtor was the

licensee and operator of South City Hospital.  (*Id*.)

The Petitioning Creditors collectively assert $3,770,000 in claims against the Alleged Debtor.

(B.D.I. 11 ¶ 8.)

## B.    The Receivership

SAH Real Estate and the Alleged Debtor defaulted under the terms of the Twain land lease

including by failing to make payments under the lease for a period of months.  (Wiggins Decl. ¶ 15.)

On May 15, 2023, Twain filed a civil action in St. Louis City Circuit Court, Missouri (the "State

Court") seeking the appointment of a receiver over Alleged Debtor and SAH Real Estate.  (*Id*.)  On

May 25, 2023, the State Court entered an Order (A000126–46) (the "Receivership Order") appointing

the Receiver to serve as general receiver over Alleged Debtor and SAH Real Estate.  (*Id*. ¶ 2.)  On

May 31, 2023, the Receiver posted the required bond and assumed the position of general receiver

over Alleged Debtor and SAH Real Estate. Under the Receivership Order, the Receiver is directed to

"operate the business of [the Alleged Debtor]."  (*Id*. ¶ 5(a).)  The Receivership Order further vests

the Receiver with all authority over the management of the Alleged Debtor:

> The Receiver shall be vested with, and is authorized and empowered to exercise,
> all the powers of [Alleged Debtor and SAH Real Estate], their officers, directors,
> shareholders, and general partners or persons who exercise similar powers and
> perform similar duties, including without limitation the sole authority and power to
> file a voluntary petition under Title 11 of the United States Code.

(*Id*. ¶ 5(e).)  Since the appointment of the Receiver as general receiver for the Alleged Debtor, subject

to the oversight of the State Court, no person other than the Receiver has the authority to manage and

operate the business of the Alleged Debtor.  The Receiver continues to operate the business of the Alleged Debtor in accordance with its fiduciary duties.

Following the appointment, the Receiver quickly assessed that the cash flows of South City Hospital were significantly negative.  (Wiggins Decl. ¶ 6.)  South City Hospital survived on borrowed funds, unpaid suppliers, and unpaid lessors that in aggregate were accumulating over a million dollars in unpaid creditor claims every month.  (*Id*.)  South City Hospital was severely lacking the business skills and financial acumen needed to manage the hospital prudently.  (*Id*. ¶ 7.)  There was no financial officer, and the accounting records could not be relied upon.  (*Id*.)  There was no revenue cycle manager, and the human resources manager worked part time.  (*Id*.)  The owners were absent.  (*Id*.)  Despite those operational financial challenges, the quality of care and patient safety were attentive, in large part because of the dedication of the employees of South City Hospital.  (*Id*.)

Prior to the appointment of the Receiver, American Healthcare Systems-Missouri ("AHS") was a prospective buyer of South City Hospital and had been providing tangible support (including direct financing) and intangible support for several months, after its interim management agreement ended in the fall of 2022.  (*Id*. ¶ 8.)  Immediately after taking over, the Receiver required funding to operate the business of the Alleged Debtor and SAH Real Estate.  AHS initially agreed to provide funding for the operations.  (A000220–227.)

On June 14, 2023, the State Court approved the Receiver's emergency motion to incur secured financing, which included a revolving line of credit from AHS secured by a priority security interest in the assets of the Alleged Debtor (A000228–232) (the "First Financing Order").  (*See* 9/19/23 Tr. at 33:5–9.)  AHS and Twain were not able to agree on terms for an assignment of the ground lease, and therefore, by mid-June, AHS stepped aside as a prospective buyer.  (Wiggins Decl. ¶ 9.)  Without the prospect of being a purchaser, AHS indicated it was no longer interested in continuing to fund weekly shortfalls.  (*Id*.)

Through its affiliate Twain Financial Partners, LLC, Twain agreed to provide financing for a brief period to allow the Receiver to assess South City Hospital's prospects for financial improvement and sale.  (*Id*. ¶ 10; A000233–240.)  On June 21, 2023, the State Court entered a second order (A000241–245) (the "Second Financing Order"), approving a revolving line of credit provided by Twain secured by the property of the receivership estate, to be repaid *pari passu* with AHS.  (*See* 9/19/23 Tr. at 33:9–13, 34:4–6.)

In addition to the challenges described above, South City Hospital suffered from several unfavorable events that restricted the Receiver's efforts to improve financial performance and develop a sale process, including:

- Employee morale and retention were negatively impacted when healthcare benefits were terminated in May (prior to the receivership).  Suppliers stopped shipment of supplies necessary for patient care, resulting in a scramble to resource supplies, which further frustrated the clinical staff.

- The lack of reliable financial records meant that South City Hospital was not able to present data pertinent to prospective buyers.  Further, the accounting staff were not trained in closing the monthly accounting books, and there were no documented procedures.

- There were deficiencies with the hospital's revenue cycle management: (a) material amounts of billable supplies and services were not being charged; (b) the hospital lacked controls to check for authorizations before billings; (c) the hospital lacked processes for discerning and correcting causes of denials; and (d) there were few contracts with commercial payors, which did not appear to be managed for pricing or collections.

- South City Hospital had mechanical failures.  The building's cooling system incurred partial failure.  Two of four elevators were inoperable.  The Receiver authorized the repairs to maintain the safety of the facility.

- South City Hospital was under investigation by the Missouri Medicaid Fraud Control Unit for billing related to a single occurrence in early 2022.

- During the Receiver's first week, South City Hospital received notification from CMS that Medicare remittances to the hospital were suspended because South City Hospital did not submit its annual cost report for 2022 (which was due May 31, 2023).

- The suspended payments comprised a significant amount of South City Hospital's cash flows.  The Receiver notified CMS of actions to prepare and submit the cost report; the Receiver

obtained a 60-day extension to submit the cost report and further obtain 50% relief from the suspended payments.  Under the Receiver's direction, South City Hospital filed the cost report, and the suspension was released.

- On June 18, 2023, water from the metropolitan storm sewer system backed up into the hospital's ground-level drains resulting in water intrusion in certain areas of the hospital. Hospital personnel took immediate steps to clean the impacted areas.  The Receiver filed a claim with the property insurer and the claim was accepted.  The inspection and remediation of damaged areas was ongoing when the Petitioning Creditors filed the involuntary petition (B.D.I. 1) ("Involuntary Petition").

(Wiggins Decl. ¶ 11.)  Notwithstanding, the Receiver viewed those issues as fixable with adequate time and financial resources.  (*Id*. ¶ 12.)  The Receiver sought input and perspective from investment bankers and (together with Twain) from prospective interested parties, and additionally sought assistance from government agencies.  (*Id*. ¶ 13.)  Despite those efforts, the financial deficit and the anticipated timeline for reaching financial stability was deemed too much for the interested parties, making the prospects of obtaining financing from other parties unrealistic during the crucial timeframe, when South City Hospital would require continued financial assistance.  (*Id*. ¶ 14.)

On August 2, 2023, Twain informed the Receiver there would be no additional financing available to support the extensive turnaround and improvement plan that South City Hospital required to achieve financial viability.  (*Id*. ¶ 15.)  The Receiver was left without funding to continue the operations, pay employees, and maintain patient safety.  (*Id*.)  Because no other party, including the owners of SA Hospital Acquisition Group, LLC, was willing and able to fund the operations, and because there was no realistic prospect for obtaining additional funding immediately, in the exercise of its business judgment, the Receiver closed South City Hospital.  (*Id*.; 9/19/23 Tr. at 12:1–5.)  By August 4, 2023, the Receiver completed the transfer of patients and laid off essentially all clinical employees.  (Wiggins Decl. ¶ 15.)  State and federal agencies were notified of the hospital closure and the termination of jobs.  (A000174, ¶ 16.)  On August 7, 2023, the State approved South City

Hospital's request for suspension of its hospital license for 90 days. (*Id*. ¶ 17.) The suspension of the license, rather than its termination, preserved its value for any prospective purchaser. (*Id*.)

Expenses remained for winding up the operations and continuing the efforts to sell the assets of South City Hospital. Twain provided financing for the Receiver to safely transfer patients and to wind up the affairs of the Alleged Debtor and SAH Real Estate. (*Id.* ¶ 18; A000246–253.) On August 3, 2023, the State Court entered a third financing order (A000254–258) (the "Third Financing Order"), pursuant to which Twain would provide a revolving line of credit to the Receiver to fund the Receiver's transition of patients and wind-up costs, as well as reimbursement of professional fees. The revolving line of credit was secured by a "superpriority administrative expense claim in favor of Twain" and by a first-priority security interest in all assets of the receivership estate (other than equipment, on which Twain had a second priority lien). (A000360; 9/19/23 Tr. at 33:9–13.) This financing enabled the Alleged Debtor to retain certain employees to complete and collect billings, secure assets, secure records, dispose of regulated materials, maintain the building, facilitate a liquidation process, and potentially assess the feasibility of pursuing causes of action that could yield proceeds for the receivership estate. (Wiggins Decl. ¶ 19.)

After the closure of South City Hospital, the Receiver engaged in dual paths of seeking a single buyer or multiple buyers in a liquidation. (*Id*. ¶ 21.) The Receiver responded to inquiries from various parties regarding the hospital property and hired an appraiser to appraise the personal property. (*Id*.) The Receiver was in the process of vetting a prospective auctioneer for South City Hospital's equipment and furnishings when the Petitioning Creditors filed the Involuntary Petition. (*Id*.) The Receiver anticipated proceeding to a sale of personal property during September 2023. (*Id*.) The creditor holding a first priority lien on the equipment had begun to recover its equipment. The Receiver solicited buyers for some or all of the remaining accounts receivable. (*Id*.)

### C.       The Chapter 11 Proceeding Dismissed by the California Bankruptcy Court

On August 11, 2023, Jeffrey Ahlholm and Lawrence Feigen, the co-managing members of the Alleged Debtor and SAH Real Estate (the "Co-Managing Members"), filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Central District of California ("California Bankruptcy Court") on behalf of the Alleged Debtor, albeit without authority under state law or the permission of the Receiver.  (*Id*. ¶ 26.)  The docket of that case reflects that the Co-Managing Members filed none of the traditional first day pleadings necessary, or at least advisable, to continue operation of South City Hospital in its current state, and no motion to secure financing was ever filed. (*Id.* ¶ 27; B.D.I. 22-4 (docket of chapter 11 case).)  On August 21, 2023, the California Bankruptcy Court dismissed the bankruptcy filing because the Alleged Debtor's Co-Managing Members had no authority under state law to file a bankruptcy case for the Alleged Debtor.  (Wiggins Decl. ¶ 28; A000161–169.)

### D.       The Receiver's Modification Motion

Following the dismissal of the California bankruptcy case, the Receiver continued to operate the business of the Alleged Debtor by completing the billing and collecting the accounts receivable, securing the medical and personnel records, and maintaining the property; the Receiver was also accommodating lessors and secured lender with respect to recovering their property and collateral from South City Hospital.  (*Id.* ¶ 25.)  Around this same time, the Receiver, AHS, and Twain determined that they made a mistake in the Third Financing Order. The Third Financing Order provided that Twain would be repaid *pari passu* with AHS and Twain loans under the First Financing Order and the Second Financing Order. (A000257; A000360; A000361.)  However, Twain had intended that its wind-up financing would be repaid before the Twain and AHS operating loans approved under the First Financing Order and the Second Financing Order.  (A000360; A000366.) Twain and AHS agreed that the Third Financing Order should be amended to provide for the payment

8

of Twain's wind-down financing prior to the repayment of the Twain and AHS operating loans.  On August 28, 2023, Receiver filed its Consent Motion to Modify Court's August 3, 2023, Order (the "Modification Motion").  (A000261 ¶ 6; A000259–265.)  The sole purpose and effect of the Modification Motion was to modify the terms of the Third Financing Order to clarify the priorities as between Twain and AHS.  (A000262.)

### E.      The Involuntary Petition for Relief filed in the Delaware Bankruptcy Court

On August 31, 2023, the Petitioning Creditors filed the Involuntary Petition in the Bankruptcy Court.  Two of the four Petitioning Creditors—Matthew Haddad and Peter Pinto (Goldberg Healthcare)—share the same attorney in the Missouri State Court receivership action as the Alleged Debtor, SAH Real Estate, and Co-Managing Members Jeffery Ahlholm, and Lawrence Feigen.  At the time of the filing of this Involuntary Petition, the Receiver was in the process of implementing a formal claims process.  (Wiggins Decl. ¶¶ 23–24; and A000147–154 (claims filed in the receivership proceedings by 3 of the 4 creditors).)

### F.      The Modification Order

The next day, the State Court held a previously-scheduled hearing on the Modification Motion and entered an order modifying the terms of the post-receivership lending between Twain and AHS (A000266–268) (the "Modification Order").  The only matter heard by the State Court at the September 1, 2023 hearing was the fully consensual adjustment in the relative priority of two sophisticated, non-debtor lender parties.  (A000259–265.)  No relief was sought or awarded against the Alleged Debtor.  (A000259–265; A000266–268.)  The Modification Order did not grant Twain a superpriority administrative expense claim, because Twain already had a superpriority administrative expense claim and lien on the Alleged Debtor's assets securing the financing under the Third Financing Order.  (A000257.)  The Modification Order did not provide for a new borrower, grant a lien on additional collateral, or authorize payment.  (A000266–268.)

Under the management of the Receiver, the Alleged Debtor continued to operate its business after the filing of the Involuntary Petition.  On September 5, 2023, the Alleged Debtor (at the direction of the Receiver) made a payment to Twain of $800,000 on the revolving line of credit. (A000365 at 368:6–8.)  The payment was made to reduce accrual of interest on an obligation that is secured by a lien on all assets of the Alleged Debtor.  (9/19/23 Tr. at 39:12–18; 41:6–7; 42:1–3.)

### G.    Expedited Trial on the Motion to Enforce and the Motion to Dismiss

On September 6, 2023, the Petitioning Creditors filed their Motion to Enforce, which sought injunctive and declaratory relief and requested an award of the Petitioning Creditors' damages for the alleged violations of the automatic stay by the Receiver, Twain GL XXV, LLC, Twain Financial Partners LCC, and AHS.  (B.D.I. 11.)  The Petitioning Creditors sought expedited consideration of the Motion to Enforce, specifically "request[ing] entry of an order scheduling a hearing on the Motion on the earliest date on which the Court has availability and requiring objections to be presented before or at such hearing."  (B.D.I. 12.)   On September 11, 2023, the Receiver filed its Motion to Dismiss seeking the dismissal of the Involuntary Petition under § 303, or in the alternative, abstention under § 305.  (B.D.I. 22.)  The Bankruptcy Court scheduled an expedited evidentiary hearing on both motions.  (B.D.I. 25.)

On September 19, 2023, the Bankruptcy Court held the evidentiary hearing.  (A000328–605.) In connection with the hearing, the Bankruptcy Court admitted 20 documents as exhibits and heard the testimony of Mr. Wiggins on behalf of the Receiver, and of Mr. Ahlholm in support of the Petitioning Creditors.  On September 20, 2023, the Bankruptcy Court issued a bench ruling on the Motion to Enforce and the Motion to Dismiss (A000462–463) ("Bench Ruling").  On September 28, 2023, the Bankruptcy Court entered its Dismissal Order granting the Motion to Dismiss and denying the Motion to Enforce as moot.  (B.D.I. 53.)

On October 12, 2023, the Petitioning Creditors filed their Notice of Appeal with respect to the Dismissal Order.  (D.I. 1.)  The appeal is fully briefed (D.I. 11, 15, 20), and Twain and AHS have filed joinders in support of the Receiver's answering brief (D.I. 16, 17).  The matter was reassigned to me on January 8, 2024.

## III.   JURISDICTION AND STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals "from final judgments, orders, and decrees" in bankruptcy proceedings.  28 U.S.C. § 158(a).

The Petitioning Creditors raise four main issues on appeal: (1) whether the Bankruptcy Court erred in holding that the Receiver had standing to request dismissal or abstention in the involuntary case; (2) whether the Bankruptcy Court erred in holding that notice was proper; (3) whether the Bankruptcy Court abused its discretion in determining that dismissal of the involuntary bankruptcy petition was appropriate; (4) whether the Bankruptcy Court abused its discretion in dismissing the Motion to Enforce as moot.

"A [bankruptcy] court's decision regarding standing is a legal conclusion subject to *de novo* review."  *In re Glob. Indus. Techs.*, 645 F.3d 201, 209 (3d Cir. 2011).  Dismissal of a petition for want of good faith under § 303 is reviewed for abuse of discretion.  *See In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015).  "A decision regarding whether to dismiss or suspend a bankruptcy case pursuant to Section 305(a) is reviewed for abuse of discretion."  *In re Mazzocone*, 200 B.R. 568, 571–72 (E.D. Pa. 1996) (collecting cases).  A bankruptcy court's decision to decline to exercise jurisdiction over related proceedings following dismissal of the underlying bankruptcy case is set aside only for abuse of discretion.  *In re Davis*, 177 B.R. 907, 910–11 (B.A.P. 9th Cir. 1995).  A "court abuses its discretion when 'its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'"  *Hagan v. Rogers*, 570 F.3d

146, 152 (3d Cir. 2009) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 146 (3d Cir. 2008)).

## IV.   ANALYSIS

### A.   Standing

The Petitioning Creditors argue that, upon filing of the petition, "a state receiver's role changes to a federally superseded custodian." (D.I. 11 at 15.) In support of that proposition, the Petitioning Creditors cite § 543(a) of the Bankruptcy Code, which applies to any "custodian [of property of the debtor] with knowledge of the commencement of a [bankruptcy] case," and which provides that a custodian is generally prohibited from administering property of the debtor "except such action as is necessary to preserve such property." 11 U.S.C. § 543(a). The Petitioning Creditors also cite § 543(b), which provides that upon filing of a bankruptcy petition, a custodian of the debtor's property shall deliver the property of the estate to the bankruptcy trustee. 11 U.S.C. § 543(b). The Petitioning Creditors argue that, because state court receivers are mere "custodians," are not included in § 1109's list of parties-in-interest, and lack "a direct legal interest in the case," the Receiver here lacked standing to move for dismissal or abstention. (*See* D.I. 11 at 14–22.)

The Bankruptcy Court held "that the receiver indeed has standing to proceed in this Court and the Court finds that the decision in *Starlite Houseboats*, from the Kansas Bankruptcy Court, is particularly on point." (9/20/23 Tr. at 7:4–8 (citing *In re Starlite Houseboats, Inc.*, 426 B.R. 375, 377 (Bankr. D. Kan. 2010).) The Bankruptcy Court further explained:

> The receiver in our case has been appointed under a robust and comprehensive order from the Missouri State Court clothing him with the power, essentially, to take all actions in connection with the companies and effectively displacing their corporate governance structure. . . . Consistent with the *Starlite* decision, this Court finds that the receiver has standing to appear and be heard, and to seek appropriate relief before this Court.

(*Id.* at 7:9–13; 7:23–25.)  According to the Petitioning Creditors, the Bankruptcy Court's reliance on the Receivership Order was erroneous.  Regardless of the Receivership Order, the Petitioning Creditors assert, the Receiver lacked standing to move for dismissal or abstention; rather, as custodian, the only relief the Receiver was permitted to seek was temporary excusal from the turnover requirements of § 543(b).  The Petitioning Creditors further argue that the Bankruptcy Court's reliance on *Starlite* was misplaced because that decision does not analyze the standing of state receivers.  (D.I. 11 at 19.)

Here, the State Court, after notice and hearing, (i) placed the Receiver in charge of operating the business of the Alleged Debtor (Receivership Order ¶ 5(a) and (d)), (ii) placed the Receiver as the sole authority to manage the actions of the Alleged Debtor (*id.* ¶ 5(e)), and (iii) enjoined the Co-Managing Members from controlling and directing the actions of the Alleged Debtor (*id.* ¶ 10).  As the Receiver points out, this is not an instance where an assignee or receiver is merely in place to administer certain assets of the Alleged Debtor.  Rather, the Receiver replaced the management role previously held by the Co-Managing Members in the Alleged Debtor.  Applying Missouri state law, the Missouri State Court determined that the Receiver was and remains the only party eligible to manage the Alleged Debtor and to take action for the Alleged Debtor.  Therefore, like the Alleged Debtor, the Receiver has standing to appear and be heard on the Involuntary Petition.

The Petitioning Creditors attempt to distinguish *Starlite* on the ground that, unlike the Starlite receiver, the Receiver here filed a motion to dismiss.  That argument is misplaced.  Like the Receiver here,[2] the receiver in *Starlite* was not only a limited asset receiver—it was a general receiver under Kansas's receivership laws, which vest a receiver "with power to prosecute and defend, in the name

---

[2] *See* Mo. Rev. Stat. § 515.510 ("If the order appointing a receiver does not expressly limit the receiver's authority to designated property or categories of property of the owner, the receiver shall be deemed a general receiver with authority to take charge over all of the debtor's property, wherever located.").

of the corporation or otherwise, all claims or suits." *Starlite,* 426 B.R. at 381 (*citing* K.S.A. 17–6901). Accordingly, the *Starlite* court concluded that the receiver was the proper party to respond to the involuntary petition for the alleged debtor. *Id.* In *Starlite*, management of the alleged debtor did not have authority to answer the involuntary petition or file a motion to dismiss—only the receiver had that authority. *See id.* The same is true here: the Receiver is in charge of the management functions for the Alleged Debtor. Like the Kansas statute that was determinative in *Starlite*, the Missouri statute provides robust authority for the Receiver, *see* R.S.Mo. § 515.545(1), and the Receivership Order provides the Receiver with authority to manage the affairs of the Alleged Debtor and to defend actions against the Alleged Debtor. [3]

---

[3] The Receiver shall have the usual powers vested, conferred, enjoyed, and exercised by receivers according to the practice of this Court, the [Missouri Commercial Receivership] Act, and other statutes of this State including, without limitation, the following:

> a. To operate the businesses of the Defendants and manage the Receivership Property;
> ***
> e. The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of Defendants, their officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code;
>
> f. To assert any rights, claims, or choses in action of the Defendants, if and to the extent that the rights, claims or choses in action are themselves property within the scope of the appointment or relate to any Receivership Property, to maintain in the Receiver's name or in the name of the Defendants any action to enforce any right, claim, or chose in action, and to intervene in actions in which the Defendants are a party for the purpose of exercising the powers under this subsection;
> ***
> h. To intervene in any action in which a Claim is asserted against the Defendants and that impacts the Receivership Property, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court. The Court, however, shall not transfer actions in which a State agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere....

(Receivership Order ¶ 5.)

14

The Petitioning Creditors are correct that the Receiver is a custodian of the assets of the Alleged Debtor under § 543 of the Bankruptcy Code.  Under state law, however, the Receiver is more than a custodian because the Receiver was placed in charge of the management of the Alleged Debtor. Under the Receivership Order, no one other than the Receiver can direct the actions of the Alleged Debtor.  (Receivership Order ¶¶ 3, 5, 10.)  So while the Bankruptcy Code does assign certain duties to a custodian, it does not circumscribe the role of management (in this case, the Receiver) with respect to the Alleged Debtor where, as here, no trustee is appointed.  The cases cited by the Petitioning Creditors do not compel a different result.[4]

The Petitioning Creditors' reliance on § 543(d) of the Bankruptcy Code is similarly misplaced. The Receiver did not need to seek relief from the turnover obligations of § 543 to fulfill the management role assigned to it under state law and to maintain its standing to seek dismissal.  As permitted under § 303(f), the business of the Alleged Debtor, under the management of the Receiver, was entitled to continue to operate as if the Involuntary Petition had not been filed.  If an order for relief had been entered and/or a trustee had been appointed, the Receiver would have then been obligated to turn over the assets to the trustee under § 543(b).  At that point, the Receiver could have sought relief from the turnover obligations under § 543(d).

The Petitioning Creditors cite to several other cases for the proposition that filing a § 543(d) motion seeking excusal from the Bankruptcy Code's turnover requirement is a prerequisite to a receiver's standing.  (D.I. 11 at 16–17.)  But standing did not turn on the receiver having filed a

---

[4] The Petitioning Creditors cite *In re Rimsat, Ltd.*, 193 B.R. 499 (Bankr. N.D. Ind. 1996), in support of their position that a receiver does not have standing to file a motion to dismiss an involuntary petition. (*See* D.I. 11 at 14–15).  *Rimsat* is distinguishable because in that case an order for relief had already been entered, and a Chapter 11 trustee was already appointed at the time the bankruptcy court was considering the receiver's motion to dismiss pursuant to § 1112.  *Rimsat*, 193 B.R at 501.  The present case involves consideration of a motion to dismiss *before* an order for relief is entered.

§ 543(d) motion in any of those cases.  For example, in *In re Koffee Kup Bakery, Inc*., the receiver filed a motion to dismiss the involuntary petition under § 303 or, alternatively, § 305.  *Koffee Kup Bakery*, 2022 WL 141516, *1 (Bankr. D. Vt. Jan. 14, 2022).  While there was a § 543(d) motion filed, that court did not rely on the existence of the motion in determining that the receiver had standing to seek dismissal of the involuntary petition.  *See id*. at *2, *5. The court determined, instead, that based on the robust provisions appointing the receiver under the Vermont state law, the receiver had standing.  *See id*. at *5.

Similarly, *In re Corporate and Leisure Event Productions, Inc.,* 351 B.R. 724, 727 (Bankr. D. Ariz. 2006) mentions the filing of a § 543(d) motion in a footnote.  *Id*. at n.6.  The issue in that case, however, was the correct corporate authority to file a voluntary bankruptcy petition.  *Id*. at 727. Unlike this case, the court in *Corporate and Leisure Event* determined that the corporate officers were entitled to file a voluntary bankruptcy case, *id*. at 732—a determination which was later abrogated by the Ninth Circuit's decision in *In re Sino Clean Energy, Inc*., 901 F.3d 1139 (9th Cir. 2018).  In any event, the standing of the receiver to seek dismissal of the case was not addressed.  With respect to the Alleged Debtor in this case, the California Bankruptcy Court determined that the Co-Managing Members did not have corporate authority to act for the Alleged Debtor and file a voluntary bankruptcy case.  (*See* A000169 (dismissing voluntary bankruptcy case).)  Other cases cited by the Petitioning Creditors do not advance their cause.[5]

---

[5] The Petitioning Creditors cite *Baron v. Schurig*, No. 13-346, 2014 WL 25519 (N.D. Tex. Jan. 2, 2014), but in that case, the involuntary petition was opposed by the alleged debtor, not a receiver appointed prior to the bankruptcy filing.  *See id*. at *6 n.3.  The Petitioning Creditors also cite *In re Skybridge Spectrum Found*., 2021 WL 2326595, at *1 (Bankr. D.D.C. June 3, 2021), *appeal denied, judgment aff'd*, 2023 WL 5561105 (D.D.C. Aug. 29, 2023).  The bankruptcy court in that case did not address the issue of a § 543(d) motion in addressing the receiver's standing; rather, the court found the receiver had standing based on the receivership order:

Finally, the Petitioning Creditors argue that a receiver can only oppose an involuntary petition if the alleged debtor fails to answer the petition, which is not the case here.  This argument is based on a faulty premise: the answer purportedly filed on behalf of the Alleged Debtor in this case was unauthorized.  (B.D.I. 40.)  The cases cited in support of the Petitioning Creditors' proposition support the Receiver's position.  For example, in *In re 318 Retail, L.L.C.*, 640 B.R. 407 (Bankr. N.D. Ill. 2022), the court focused on the express language of the Illinois receivership statute and the receivership order in determining that the receiver could file a motion to dismiss but could not answer the involuntary petition, as the Illinois receivership statute was different from the Kansas receivership statute in *Starlite*:

> Unlike the Kansas statute, the Illinois receivership statute, 210 ILCS 47/3-508 (2020), does not specifically mention defending "all claims or suits."  It provides that the receiver "[s]hall exercise those powers and shall perform those duties set out by the court" and "[s]hall take such action as is reasonably necessary to protect or conserve the assets or property of which the receiver takes possession, or the proceeds from any transfer thereof, . . . ." 210 ILCS 47/3-508(a), (c).

*Id*. at 412.  The Petitioning Creditors cite *In re Skybridge Spectrum* in support of this argument as well, but the *Skybridge* court also determined that the receiver could seek dismissal of the involuntary bankruptcy based on the broad powers granted in the receiver's appointment.  *See Skybridge Spectrum*, 2023 WL 5561105, at *1 n.3.

---

> In the Receivership Order, the Receiver is authorized to "do all things . . . ordinarily done . . . by owners, managers, and operators of businesses and property similar to that possessed by the receiver" and, further, authorizes the receiver to petition the California State Court to "retain legal counsel to assist the receiver with issues arising out of the bankruptcy proceedings that affect the receivership". [citation omitted]. *The Receiver* is the party upon whom [petitioning creditor] served the Summons in this case, and, *as the only entity with authority to act on behalf of the Alleged Debtor entities, clearly has standing in this case to contest the [involuntary] Petition.*

*Id*. at *1, n. 3 (emphasis added).  Thus, *Skybridge Spectrum* supports the Bankruptcy Court's determination that the Receiver had standing to pursue the Motion to Dismiss in this case.

The Receiver is a custodian of the assets of the Alleged Debtor.  In addition, the Receiver is charged with operating the business of the Alleged Debtor and performing management functions for the Alleged Debtor.  The Receiver has been empowered to defend all actions, such as an Involuntary Petition, for the Alleged Debtor.  The Petitioning Creditors have cited no provision in the Bankruptcy Code that prevents the Receiver from exercising its power to manage the Alleged Debtor and to represent the Alleged Debtor's interests here.  The Court finds no error in the Bankruptcy Court's conclusion that the Receiver had standing.

### B.    Notice of the Motion to Dismiss Was Proper

The Petitioning Creditors argue that the Bankruptcy Court granted dismissal under § 305, and that notice to all creditors was therefore required under Bankruptcy Rule 2002(a).  *See* Fed. R. Bankr. P. 1017(d) ("The court shall not dismiss a case or suspend proceedings under § 305 before a hearing on notice as provided in Rule 2002(a).").  The Bankruptcy Court, however, cited only § 303 in its Bench Ruling, which, aside from noting the alternative relief requested in the Receiver's motion, does not mention abstention.  (9/20/23 Tr. at 13:20–21 (determining "dismissal of this case is appropriate under Section 303").)

Notice to all creditors on a motion to dismiss an involuntary petition under § 303 (except under prescribed circumstances) is required only after an order for relief is entered.  *See In re Centennial Ins. Assoc., Inc.*, 119 B.R. 543, 545 (Bankr. W.D. Mich. 1990).  Here, the list of creditors had not been filed, which is not surprising since the list is only required to be filed after entry of the order for relief.  *See* Fed. R. Bankr. P. 1007(a)(2) (list of creditors must be filed within seven days after entry of an order for relief).  Indeed, there are certain prescribed circumstances in which notice to all creditors would be required for dismissal of an involuntary bankruptcy petition before entry of an order for relief.  Section 303(j) specifically provides for such notice as follows:

18

> Only after notice to all creditors and a hearing may the court dismiss a petition filed under this section –
>
> > (1) on the motion of a petitioner;
> > (2) on consent of all petitioners and the debtor; or
> > (3) for want of prosecution.

11 U.S.C. § 303(j).  None of those circumstances apply.  As the Bankruptcy Court noted, "Prior to the entry of an order for relief the scope of appropriate notice is determined by the circumstances of the case and the exercise of the Court's sound discretion."  (9/20/23 Tr. at 8:13–16.)  *See, e.g., In re Hatfield*, 2008 WL 906505 (N.D. Cal. 2008) (notice of hearing on motion to dismiss involuntary petitions pursuant to § 305(a)(1), even months after the filing, was sufficient where service had been effectuated "on everybody who has shown any interest in this case" and there was no assertion of prejudice based on the manner of notice or that any particular party failed to receive notice).  With respect to the expedited consideration of the Motion to Dismiss, the Bankruptcy Court was "satisfied that notice here is and was appropriate, and that necessary parties have had a meaningful opportunity to participate in these proceedings given the numerous joinders and pleadings submitted by the parties beyond the petitioning creditor and the receiver."  (9/20/23 Tr. at 9:2–7.)  The Court finds no abuse of discretion in the Bankruptcy Court's determination that such notice, prior to the entry of an order for relief or the deadline for filing a 2002 list, was appropriate.

### C.     Dismissal Under Either § 303 or § 305 Was Not an Abuse of Discretion

The Petitioning Creditors argue that "[a]lthough the Bankruptcy Court cited section 303 in its dismissal, substantively, the Bankruptcy Court dismissed the Bankruptcy Case under section 305 using the best interests test."  (D.I. 11 at 22 n.6.)  The Court disagrees.  The Bench Ruling reflects that Bankruptcy Court agreed with the parties that "the appropriate standard to measure the motion to dismiss comes from case law which teaches that Courts consider *the totality of circumstances* in evaluating whether to dismiss an involuntary petition."  (9/20/23 Tr. at 9:8–15 (emphasis added).)  It

further observed that with respect to the dismissal of an involuntary petition, "the gravamen of the analysis goes to what the Court determines on an appropriate evidentiary record is in the **_best interest of the alleged debtor and its creditors_**." (*Id*. at 9:12–15 (emphasis added).)  Application of those standards is consistent with dismissal under both §§ 303 and 305.

**1.   No Abuse of Discretion in Granting Dismissal Under § 303**

The Bankruptcy Court evaluated the totality of the circumstances and determined that dismissal under § 303 was appropriate.  An involuntary petition may be dismissed where it is not filed in good faith, and where movant has shown by a preponderance of the evidence that creditors have acted in bad faith, even where the other requirements of § 303 are met.  *See Forever Green*, 804 F.3d at 334–35.  In conducting this fact intensive review, courts may consider a number of factors, including, but not limited to, whether the creditors satisfied the statutory criteria for filing the petition; whether the involuntary petition was meritorious; whether the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; whether there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; whether the filing was motivated by ill will or a desire to harass; whether the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; whether the filing was used as a tactical advantage in pending actions; whether the filing was used as a substitute for customary debt-collection procedures; and whether the filing had suspicious timing.  *See id.* at 336.  A bad faith finding is reviewed for abuse of discretion.

Whether there was collusion or bad faith, the purpose for which the Involuntary Petition was filed, and the timing of its filing, were all issues addressed in the parties' briefs on the Motion to Dismiss.  The Motion to Dismiss questioned the "dubious" motivation and purpose of the involuntary filing, based upon its timing and circumstantial evidence of potential collusion, which "suggest that this filing was possibly orchestrated by Jeffrey Ahlholm and Lawrence Feigen in an attempt to get

around their lack of authority to initiate a voluntary proceeding for the Alleged Debtor." (*See* B.D.I. 22 at ¶¶ 48–51 & n.3 ("The closeness of [Petitioning Creditors] Mr. Haddad and Mr. Pinto's relationship to [Co-Managing Members] Jeffery Ahlholm and Lawrence Feigen could hardly be better demonstrated then by them sharing an attorney.").)  The Petitioning Creditors responded that the involuntary petitions were filed in good faith and to ensure all creditors are treated fairly.  (B.D.I. 33 at 23–26.)  In light of the parties' arguments, consideration of the totality of the circumstances was appropriate here.  *See, e.g., Forever Green*, 804 F.3d at 330 (applying totality of the circumstances test to a determination of whether involuntary petition was filed in bad faith).

Among other things, the Bankruptcy Court noted the lack of authority of the Co-Managing Members to have made the purported chapter 11 petition in California; acknowledged the Petitioning Creditors' lack of authority to have filed a purported answer to the petition on behalf of the Alleged Debtor; and found that the involuntary filing was ultimately driven by a few parties' dissatisfaction with certain decisions by the Receiver.

The Bankruptcy Court noted at the outset that the Co-Managing Members filed a voluntary chapter 11 petition in the California Bankruptcy Court, despite lacking any authority to do so, and that dismissal of the chapter 11 petition was immediately followed by the Involuntary Petition here:

> This filing occurred despite the fact that the receivership order gave the receiver the power to take all actions for the corporate entities and specifically vested exclusive authority to file a petition for the company in the receiver.
>
> The California Chapter 11 case was promptly dismissed by that Court for lack of authority to file a petition. Dismissal occurred in California on August 21st, 2023. Ten days later, on August 31st, 2023, the [in]voluntary petition was filed in this Court by the petitioning creditors . . . .

(9/20/23 Tr. at 5:8–20.)  The Bankruptcy Court further noted it was "highly unlikely that the purported answer filed by the [Alleged D]ebtors was an action permitted under the receivership order."  (*Id*. at 7:16–18.)

After a full evidentiary hearing, which included the admission of relevant documents and witness testimony, the Bankruptcy Court concluded that, "At most, petitioning creditors contend that they would endeavor to do things a little differently from the receiver.  This is not a sufficient basis for the Court to exercise its authority and to unwind the receivership process that [ha]s already been pending for several months." (Tr. at 12:14–19.)  Noting that no party appealed the Receivership Order, which was a final order, the Bankruptcy Court found, based on the evidence and testimony, "that the receiver has been in place for months under the supervision of a Court of competent jurisdiction and there is little or no discernible benefit that would accrue from stopping this process and starting from ground zero in a bankruptcy proceeding." (*Id*. at 9:16–20.)  Moreover, while "[t]he petitioning creditors [we]re disappointed with what they characterized to be a lack of engagement or activity by the receiver in several different spheres" (*id*. at 10:11–14), the Bankruptcy Court went through each of the main areas of concern raised and found those concerns adequately refuted by the facts and testimony presented by the Receiver.  (*See id*. at 10:15–13:19.)  Thus, "[t]o the extent that stakeholders are unhappy with the decisions and priorities of the receiver, redress is best directed to the Receiver and the Missouri Court rather than commencing a brand new proceeding here." (*Id.* at 10.)  As there is a rational basis for finding that the good faith requirement of § 303 was not met, the Court finds no abuse of discretion in the Bankruptcy Court's dismissal under that provision.

## 2. No Abuse of Discretion in Granting Dismissal, in the Alternative, Under § 305

To the extent that the Bench Ruling granted dismissal, in the alternative, on the basis of § 305—and considered the arguments raised by the parties regarding the factors applicable to such relief—the Bankruptcy Court merely provided further support for its decision that dismissal was appropriate under either standard.  Although not necessary here, the Court will address the Petitioning Creditors' arguments with respect to abstention under § 305.

Section 305(a) of the Bankruptcy Code permits a bankruptcy court to dismiss or suspend proceedings in a pending case:

> The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if . . . the interests of creditors and the debtor would be better served by such dismissal or suspension.

11 U.S.C. § 305(a)(1).  The decision to dismiss or suspend under § 305(a) is discretionary and must be made on a case-by-case basis.  *In re A & D Care, Inc.*, 90 B.R. 138, 141 (Bankr. W.D. Pa. 1988).  Courts in this circuit look to the totality of the circumstances and a broad range of factors when analyzing whether dismissal or abstention under § 305(a)(1) is appropriate.  Some of the (somewhat overlapping) factors considered may include the following:

> (1) efficiency and economy of administration and avoiding an unnecessary duplication of efforts and a waste of time and resources;
>
> (2) whether an alternative means is available for achieving an equitable distribution of the assets;
>
> (3) whether a non-federal insolvency has advanced so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process;
>
> (4) whether federal proceedings are necessary to reach a just and equitable solution;
>
> (5) the lack of any advantage to creditors by invoking federal bankruptcy jurisdiction and/or the lack of prejudice to parties resulting from abstention and dismissal;
>
> (6) the existence of minimal assets to administer; and
>
> (7) the motivation and/or purpose of the parties seeking to invoke federal bankruptcy jurisdiction.

*In re AMC Invs., LLC*, 406 B.R. 478, 487–88 (Bankr. D. Del. 2009); *see also In re AIG Fin. Prod. Corp*, 651 B.R. 463, 477 (Bankr. D. Del. 2023).  As the Petitioning Creditors note, some courts have held that "factors two [through] six should be grouped together, since 'all of these factors specifically touch on the availability of an alternative forum to achieve an *equitable* distribution.'"  (D.I. 11 at 33

(quoting *In re Acis Capital Mgmt.*, 584 B.R. 115, 146 (Bankr. N.D. Tex. 2018) (emphasis in original).)
The Court will follow the Petitioning Creditors' approach.

With respect to the first factor, efficiency and economy of administration, as the Receiver
notes, courts regularly dismiss bankruptcy cases to permit receiverships to complete the liquidation
and distribution process.[6]  Here, the Bankruptcy Court determined that the receivership action in the
State Court provided the most efficient means to provide an equitable distribution for creditors as
"there is little or no discernible benefit that would accrue from stopping this process and starting from
ground zero in a bankruptcy proceeding."  (9/20/223 Tr. at 9:18–20.)  The Petitioning Creditors argue
that this is a "conclusory statement[]" that is "not supported by the evidence in the record" and that
there would be little duplication of efforts if the chapter 11 case were to proceed as the Receiver was
"still in the initial stages of the proceeding."  (D.I. 11 at 30.)

The record reflects, however, that the Receiver had accomplished a tremendous amount at the
time the Dismissal Order was entered.  The Receiver had evaluated the situation at South City
Hospital and determined that the available financial information was unreliable, such that a traditional
marketing process for the facility as a going concern would be significantly delayed.  (Wiggins Decl.
¶ 11(iii).)  The Receiver concluded that significant additional funding would be necessary to continue
the active operations of South City Hospital to have any chance to achieve a sale of the business.  (*Id.*
¶ 12.)  As the Receiver had no funding for the significant shortfalls in income for an extended period,
the Receiver set out to obtain funding.  No party was willing to provide the funding necessary to
maintain patient safety and make payroll.  (*Id.* ¶ 15.)  The Co-Managing Members were invited to

---

[6] *See, e.g.*, *In re Koffee Kup*, 2022 WL 141516, at *9 (dismissing in favor of state court
receivership); *In re Packard Square LLC*, 575 B.R. 768, 783 (Bankr. E.D. Mich. 2017), *aff'd sub
nom. In re Packard Square, LLC*, 586 B.R. 853 (E.D. Mich. 2018) (dismissing and barring refiling
against the debtor for a period of two years); *In re Starlite*, 426 B.R. at 389 (dismissing in favor of
state court receivership); *In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981)
(dismissing in favor of a federal equity receiver).

provide additional funding to support the continued operations, but they failed to provide any alternatives.  (9/19/23 Tr. 12:1–5.)  As the Receiver could not put the patients at risk or leave South City Hospital's dedicated employees unpaid for work that they performed, the Receiver was required to quickly close South City Hospital.  (Wiggins Decl. ¶ 15.)  The Receiver safely and efficiently transitioned all patients to alternate hospitals, and South City Hospital's workforce was reduced commensurate with the needs of the facility and to facilitate a liquidation process.  (*Id.*)  The Receiver searched for a purchaser interested in buying the operation, engaged in discussions with potential purchasers that wanted to operate South City Hospital as a healthcare provider, hosted tours, and established a data room.  (9/19/23 Tr. at 12:21–13:1.)  The Receiver marshalled the assets, continued collecting receivables, and worked on a claims process to assess the claims.  (Wiggins Decl. ¶¶ 22–23.)  The Receiver further evaluated potential claims to recover additional funds for distribution.  (9/19/23 Tr. at 13:1–2.)  The Receiver reduced expenses at South City Hospital while maintaining the staffing and resources to efficiently and effectively complete the liquidation process.  (Wiggins Decl. ¶ 22.)  Because the situation inherited by the Receiver and available financing options curtailed alternatives, the Receiver prepared to move forward with a sale of the equipment and furnishings to provide at least some recovery for the creditors.  (*Id.*)  The Receiver prepared to sell the equipment, furnishings, inventory, and any remaining uncollected accounts receivable, and the Receiver prepared to, ultimately, dispose of the building.  (*Id.*)

The Petitioning Creditors argue that the "significant legal work done in the state court [would not be] wasted as it could be helpful to a bankruptcy trustee," while also arguing that the Receiver has done very little and that the case should be taken in an entirely different direction.  (*See* D.I. 11 31–33.)  In contrast with the efforts set forth above, proceeding with a bankruptcy case in these circumstances could be costly and risky.  The record reflects that the Petitioning Creditors did not appeal the Receivership Order but rather filed claims; that they had not been managing the operations

for at least a year before the Receiver was appointed (*id.* ¶ 8; 9/19/23 Tr. at 54:1–13);  that, should the Petitioning Creditors restart the entire process, they would need to secure an additional $6 million on top of the capital structure in a speculative bid to restart South City Hospital (Wiggins Decl. ¶ 8; 9/19/23 Tr. at 54:1–13); that no agreement was in place to fund a reorganization or orderly liquidation (9/19/23 Tr. 76, 99–102); that while a going concern sale might be possible, that prospect is impaired by the fact that the hospital has ceased operations; and that a potential buyer would have to approach the transaction as "a passion project" rather than as a typical rational economic actor.  The Court finds no error in the Bankruptcy Court's determination that efficiency and economy of administration favored dismissal.

With respect to factors 2 through 6—regarding the availability of an alternative forum to achieve an equitable distribution—the Bankruptcy Court concluded that the receivership would achieve an equitable distribution.  The Missouri Commercial Receivership Act (R.S.Mo. § 515.500 *et seq.*) is a comprehensive act that provides guidance to receivers and judges on receivership powers and duties (§ 515.545), provides a sale process (§ 515.645), establishes a streamlined claims process (§ 515.615 to § 515.635), and specifies a hierarchy of claims for distribution, akin to the priority scheme provided in the Bankruptcy Code (§ 515.625).   The Petitioning Creditors argue this determination lacked support in the record as the Bankruptcy Court generally failed to consider the disadvantages of a liquidation versus the advantages of a sale through chapter 11.

With respect to the disadvantages of liquidation, the Receiver did not foreclose a sale of the business; rather, Mr. Wiggins testified as to having no preferences or disinclination regarding any type of potential purchaser, that he was engaged and attempting to sell assets of the Alleged Debtor and SAH Real Estate through an organized sale process, including looking for alternatives to sell South City Hospital to someone who would operate the business.  (*See* Wiggins Decl. ¶¶ 13, 21; 9/19/23 Tr. at 19:4–22:24, 12:21–13:1.)  The record supports that the Receiver took steps to maintain

26

the license for the facility for as long as possible.  (Wiggins Decl. ¶ 17.)  The Petitioning Creditors offered no evidence to demonstrate that the Receiver was selling assets "potentially far below market value" or eviscerating any potential for a restart of South City Hospital.  (D.I. 11 at 33.)  Moreover, there was no evidence that the Bankruptcy Code would have provided for a greater recovery than the receivership.  (D.I. 11 at 34.)  As the Bankruptcy Court correctly noted, the Receivership Order authorizes the Receiver to file a bankruptcy case at any time, to the extent a potential purchaser emerged for which the powers available under the Bankruptcy Code presented a more advantageous sale medium.  (9/20/23 Tr. 11:12–17.)

The Bankruptcy Court did not disregard the benefits of proceeding under the Bankruptcy Code.  (*Id*. at 10–11.)  It concluded that "the [R]eceiver, in fact, has the power and ability to deal with the assets and the issues identified by the petitioning creditors by virtue of the powers afforded to him under the receivership order and applicable provisions of the Missouri [Commercial Receivership Act]."  (*Id*. at 9:21–10:1.)  The Bankruptcy Court also observed that "[t]he petitioning creditors have not identified any particular tool or resource available in a Chapter 11 proceeding that is not already largely available to the receiver by virtue of the receivership order under the applicable Missouri statute."  (9/20/23 Tr. 12:10–14.)

As the Bankruptcy Court recognized, one reason to invoke federal court jurisdiction is if the assets are disbursed among various jurisdictions.  In this instance, however, all of the operations and assets of South City Hospital are located in the City of St. Louis, and all of the assets are currently being administered in a receivership under the supervision of the State Court.  (Wiggins Decl. ¶¶ 4–5.)

The Petitioning Creditors argue that the Bankruptcy Court erred in determining that WARN Act claimants (former employees of the Alleged Debtor) would be "better served" in the receivership action.  (D.I. 11 at 37–38.)  The Petitioning Creditors mischaracterize the Bankruptcy Court's

conclusions, which were that the receivership presented an alternative forum to achieve an equitable distribution and that the difference in the treatment of WARN Act claims "did not mandate imposition of a bankruptcy proceeding in place of the receivership."  (9/20/23 Tr. at 12:20–13:9.)  The Bankruptcy Court observed that, while the WARN Act claimants supported the bankruptcy, they had already commenced a class action in Missouri; that employee claims may be entitled to priority under Missouri law (although not identical to the treatment that they might receive under the Bankruptcy Code); and that the WARN Act claimants have redress to a court of competent jurisdiction.  In sum, the Petitioning Creditors offered no basis to disagree that the receivership provided an alternative forum for a fair and equitable distribution to creditors.

Finally, with respect to the seventh factor—the purpose for which bankruptcy jurisdiction has been sought—the Bankruptcy Court found that the primary purpose of the Involuntary Petition was the Petitioning Creditors' disagreement with some of the Receiver's decisions, which was not a proper basis to order relief on the chapter 11 petition:

> The petitioning creditors have not identified any particular tool or resource available in a Chapter 11 proceeding that is not already largely available to the receiver by virtue of the receivership order under the applicable Missouri statute.  At most, petitioning creditors contend that they would endeavor to do things a little differently from the receiver.  This is not a sufficient basis for the Court to exercise its authority and to unwind the receivership process that is already been pending for several months.

(9/20/23 Tr. at 12:10–19.)  In other words, the Bankruptcy Court found that the chapter 11 proceeding would serve no purpose not already served in the receivership action.  There is no abuse of discretion in the Bankruptcy Court's determination that the above factors, together with the totality of the circumstances, favored dismissal.

### D.  Denying the Motion to Enforce as Moot Was Not an Abuse of Discretion

The Petitioning Creditors argue that the Bankruptcy Court abused its discretion in denying the Motion to Enforce the automatic stay on the basis that it was moot.  The Receiver argues that there

was no abuse of discretion for at least three reasons: that there was no violation of the automatic stay, willful or otherwise; that the Petitioning Creditors lacked standing to seek contempt for violation of the automatic stay, as they failed to establish (and indeed lacked) any particularized direct injury and any such claim belonged to the general estate; and that the doctrine of prudential mootness applies.

I agree that the Bankruptcy Court did not abuse its discretion when it dismissed the motion as moot. The primary complaint raised by the Petitioning Creditors is that the Receiver (1) improperly obtained an order from the Missouri State Court adjusting the relative priorities between AHS and Twain (which the parties had already agreed to) the day after the Involuntary Petition was filed, and (2) improperly exercised its authority to manage the affairs and business of the Alleged Debtor during the gap period by making the payment to Twain to reduce the accrual of interest on the revolving line of credit. But following dismissal of the Involuntary Petition, the Receiver continues to manage the Alleged Debtor and to operate the business. Even assuming for purposes of the argument that either of the challenged actions would have violated the automatic stay, the Involuntary Petition has now been dismissed and the Receiver can continue to conduct the business of the Alleged Debtor, including performing the same challenged actions. Accordingly, the Bankruptcy Court did not abuse its discretion in dismissing the Petitioning Creditors' Motion to Enforce the automatic stay.

## V.    CONCLUSION

For the foregoing reasons, the Dismissal Order will be affirmed. The Court will issue a separate Order consistent with this Opinion.